United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 20, 1997 Decided November 12, 1997 

 No. 96-7233

 James May, et al., 

 Appellants 

 v.

 Shuttle, Inc., et al., 

 Appellees 

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 94cv01019)

 ---------

 Before: Silberman, Williams, and Rogers, Circuit Judges.

 J U D G M E N T

 This cause came to be heard on the record on appeal from 
the United States District Court for the District of Columbia, 


and was briefed and argued by counsel. On consideration 
thereof, it is

 ORDERED and ADJUDGED, by this Court, that the 
judgment of the District Court appealed from in this cause is 
hereby affirmed. It is

 FURTHER ORDERED, by this Court, that the district 
court's memorandum opinion in May v. Shuttle, Inc., No. 
94cv01019 (D.D.C. Sept. 5, 1996) is hereby published as if it 
were an opinion of our court. We note, however, that the 
collective bargaining agreement between Trump Shuttle, Inc. 
and the International Association of Machinists and Aero-
space Workers expired on December 31, 1989. Thereafter, 
the only function the agreement could have performed would 
have been to serve as the temporary "status quo" while the 
parties pursued the "major dispute" collective bargaining 
procedures of Sections 5 and 6 of the Railway Labor Act. 
But for the reasons made clear by the district court, Shuttle 
could have been under no obligation to engage in such 
bargaining in the absence of a certified representative with 
which to bargain. Therefore it is unnecessary for us to 
decide whether any terms of a collective bargaining agree-
ment may survive the loss of union representation (an issue 
which we previously addressed in passing). See Association 
of Flight Attendants v. United Airlines, Inc., 71 F.3d 915, 918 
(D.C. Cir. 1995). It is

 FURTHER ORDERED, by this Court, sua sponte, that 
the Clerk shall withhold issuance of the mandate herein until 
seven days after disposition of any timely petition for rehear-
ing. See D.C. Cir. R. 41(a)(1) (January 1, 1994). This 
instruction to the Clerk is without prejudice to the right of 
any party at any time to move for expedited issuance of the 
mandate for good cause shown.

 Per Curiam 
 For the Court:

 Mark J. Langer, Clerk 

 

 


 United States District Court

 FOR THE DISTRICT OF COLUMBIA

 Issued September 5, 1996

 Civil Action No. 94-1019(NHJ)

 James May, et al., 

 Plaintiffs
 
 v.

 Shuttle, Inc., et al., 

 Defendants 

 

 MEMORANDUM OPINION

 Plaintiffs are eighty-six former USAir Shuttle fleet service 
workers.1 The five defendants are Shuttle, Inc. ("Shuttle"), 
USAir, Inc. ("USAir"), International Association of Machin-
ists and Aerospace Workers ("IAM"), Citicorp, and Citibank, 
N.A. Before the Court are the motions for summary judg-
ment filed by all defendants, as well as the motion of plain-
tiffs for summary judgment on the issue of the single carrier 
proceeding and the motion of nineteen of the plaintiffs 
("Barone et al.") for summary judgment on certain age dis-
crimination issues. Shuttle has also filed a cross-motion for 
summary judgment on the issues raised by Barone et al. 
Altogether, there are seven motions for summary judgment 
to be resolved at this time. The Court heard oral argument 
from the parties on all seven motions on June 21, 25, and 27, 
1996. Upon consideration of the motions, the supporting 

__________
 1 Two of the original plaintiffs, Raymond Heim and Pierre L. 
Schrichte, have been voluntarily dismissed. One of the original 
plaintiffs, Kenneth Wall, is now deceased and the administrator of 
his estate has been substituted.


and opposing memoranda, the oral argument of counsel, and 
the entire record herein, the Court concludes that it must 
grant the motions of all defendants and deny the motions of 
plaintiffs.

 Background

 Most of the plaintiffs formerly worked at Eastern Air Lines 
as fleet service workers for the Eastern Shuttle. The East-
ern Shuttle offered hourly, unreserved flights between New 
York and Washington, and between New York and Boston. 
Plaintiffs' basic job duties included handling baggage, clean-
ing aircraft, and guiding aircraft to and from passenger gates. 
Plaintiffs were represented by IAM, which had negotiated a 
collective bargaining agreement with Eastern on plaintiffs' 
behalf. In 1989, in the midst of a prolonged strike, Eastern 
sold the Shuttle to Donald Trump. He financed the purchase 
through a $380 million loan from a syndicate of twenty-two 
banks, including defendant Citibank. The newly named 
Trump Shuttle began operations on June 7, 1989. Trump 
hired plaintiffs to staff the Trump Shuttle, and Trump Shuttle 
and IAM entered into a collective bargaining agreement. 
Forty-nine plaintiffs worked at LaGuardia Airport in New 
York, New York ("LaGuardia"), twenty-three worked at Lo-
gan Airport in Boston, Massachusetts ("Logan"), and four-
teen worked at Washington National Airport in Arlington, 
Virginia ("National").

 By 1990, Trump Shuttle and Donald Trump were experi-
encing serious financial difficulties. Trump Shuttle never 
made a profit, in part because of the large debt incurred by 
Trump to purchase and upgrade the Shuttle. By September 
1990, the Trump loans were in default and the banks sought 
to restructure the debt. The banks decided to assume owner-
ship of the Shuttle and began to search for a major airline to 
manage it in order to avoid selling the Shuttle in the de-
pressed airline market. They decided to attempt to improve 
the Shuttle's operating performance, contemplating a sale at 
a later date.

 After failed negotiations with Northwest Airlines, the 
banks reached an agreement with USAir. The complex 
management agreement with USAir provided that USAir 


would manage the Shuttle for ten years, with an option to 
buy. Under the agreement, USAir would be responsible for 
Shuttle operations, including fares, financial record keeping, 
advertising, promotions, aircraft maintenance, and labor rela-
tions. USAir would operate the Shuttle under the name 
"USAir Shuttle." Shuttle would continue to operate as a 
separate airline under its own operating certificates issued by 
the Department of Transportation ("DOT") and the Federal 
Aviation Administration ("FAA") to allow the airline to be 
sold if USAir decided not to exercise its option to buy the 
Shuttle. On April 7, 1992, Trump Shuttle merged into a 
newly created corporation, Shuttle, Inc., which became the 
corporate successor of Trump Shuttle. On April 12, 1992, the 
USAir management agreement closing occurred.

 The DOT and FAA certificates required the Shuttle to 
maintain responsibility for its own flight operations (including 
pilots and flight attendants), but did not require Shuttle and 
USAir to separate the ground service employees. USAir 
planned to maintain separate groups of flight personnel but to 
integrate the ground service employees of USAir and Shuttle, 
including the fleet service workers, and treat them as a single 
workforce. IAM had demanded that USAir agree to inte-
grate the ground service employees before IAM would ap-
prove the USAir management agreement. Without the ap-
proval of IAM, it appears that USAir could not have entered 
into the management agreement. The large group of fleet 
service workers at USAir (there were more than 8,000 USAir 
fleet service workers and 135 Shuttle fleet service workers) 
was not represented by a union.

 In order to integrate the two groups of employees, USAir, 
IAM, and Shuttle had to resolve numerous issues, including 
union representation. USAir and IAM agreed to resolve 
representation questions by requesting the National Media-
tion Board ("NMB") to issue a ruling that, for purposes of 
representation under the Railway Labor Act ("RLA"), USAir 
and Shuttle were a "single carrier." On April 2, 1992, USAir 
filed a petition with the NMB seeking single carrier status. 
On May 12, 1992, IAM joined USAir's petition.


 Both the United Steelworkers of America and IAM peti-
tioned to represent the fleet service workers. On August 10, 
1992, the NMB ruled that USAir and Shuttle constituted a 
single carrier for purposes of union representation, and an 
election was held to decide which union, if any, would repre-
sent the combined group of fleet service workers. When the 
votes were counted, the NMB announced that less than a 
majority of the fleet service workers had voted for union 
representation. Accordingly, the result of the election was 
that the combined group of fleet service workers would not be 
represented by a union.

 After the election, the fleet service workers at Shuttle were 
no longer treated as if they were represented by a union. 
Union dues were no longer deducted from their paychecks 
after the election. The IAM notified plaintiffs by letter dated 
August 31, 1992, that they were no longer represented by the 
union. Eventually, the Shuttle fleet service was not integrat-
ed with USAir, in part because of difficulties resolving senior-
ity disputes.

 In March 1993, after the NMB certified the election result, 
Shuttle changed several conditions of plaintiffs' employment, 
including extending the work hours and limiting overtime 
pay. Also in March 1993, Shuttle furloughed thirty individu-
als in the fleet service group--twenty-two at LaGuardia, five 
at Logan, and three at National. Ten of those individuals are 
plaintiffs here. The decision to furlough those fleet service 
workers was made by Terry V. Hallcom, President and CEO 
of Shuttle, based on his conclusions that he could cut costs 
and replace substandard work by using an outside contractor. 
Shuttle contracted with Hudson General Corporation to per-
form the work. In November 1993, eighty-eight individuals 
in the fleet service group were furloughed or elected volun-
tary retirement in lieu of furlough--forty-three at LaGuardia, 
twenty-four at Logan, and twenty-one at National. Seventy-
three of those individuals are plaintiffs here.2 At that time, 

__________
 2 The remaining three plaintiffs were furloughed on the follow-
ing dates: John P. Luti (Logan)--September 22, 1992; Harold 
Young (Logan)--September 22, 1992; and Lance J. Riddick (La-
Guardia)--July 3, 1993.


Shuttle subcontracted all fleet service work to Hudson Gener-
al. Hallcom reached the decision to subcontract the remain-
ing fleet service workers after determining that approximate-
ly $2 million a year could be saved by subcontracting the 
work. Shuttle had no control over the selection of employees 
by Hudson General.

 Furloughing the fleet service workers was part of Shuttle's 
cost cutting strategy in its attempt to make the airline 
profitable and recover Trump's debt. From April 12, 1992, to 
August 31, 1995, the total number of Shuttle employees was 
reduced from 972 to 553.

 Discussion

 There are eighteen counts in plaintiffs' complaint. Plain-
tiffs bring their federal statutory claims pursuant to the 
Employee Retirement Income Security Act ("ERISA"), 29 
U.S.C. ss 1001-1461 (1994), the Age Discrimination in Em-
ployment Act ("ADEA"), 29 U.S.C. ss 621-34 (1994), the 
Worker Adjustment and Retraining Notification Act 
("WARN"), 29 U.S.C. ss 2101-09 (1994), and the Railway 
Labor Act ("RLA"), 45 U.S.C. ss 151-88 (1994). Plaintiffs 
also bring state law claims against all defendants and a claim 
against the IAM for breach of the duty of fair representation. 
The Court will first address the claims against USAir and 
Shuttle (parts I-VI, below), and will then address the remain-
ing defendants separately (parts VII-VIII, below).

I.ERISA, 29 U.S.C. ss 1001-1461 (1994), Counts 9-13 

 Section 510 of ERISA guarantees that no employee will be 
terminated where the purpose of the discharge is the interfer-
ence with the employee's pension rights. 29 U.S.C. s 1140 
(1994). Plaintiffs claim that defendants violated ERISA when 
defendants furloughed plaintiffs without allowing them to 
work up to age sixty-five (Count 9); when USAir did not offer 
plaintiffs the same benefits it offered to non-Shuttle employ-
ees (Count 10); when defendants furloughed plaintiffs be-
cause defendants did not want to pay for greater health care 
benefits as plaintiffs got older (Count 11); when defendants 
furloughed plaintiffs because they did not want to assume the 
increasingly greater risk that plaintiffs would suffer a long 


term disability (Count 12); and when defendants furloughed 
plaintiffs to keep plaintiffs from accruing further benefits 
under the 401(k) retirement plan (Count 13).

 This Circuit has recently noted that a "corporate organiza-
tion change," such as the decision to sell a subsidiary, is 
generally not the type of action that is prohibited by ERISA. 
Andes v. Ford Motor Co., 70 F.3d 1332, 1336 (D.C. Cir. 1995). 
Because plaintiffs were furloughed as part of a reduction in 
force, and the entire fleet service group was eliminated and 
replaced with an outside contractor, the Court considers their 
furloughs to be a "corporate organizational change." Accord-
ingly, plaintiffs must show specific evidence of unlawful moti-
vation in order to avoid having summary judgment entered 
against them.

 Even if the furloughs are not considered a corporate orga-
nizational change, but are to be treated as the discharges of 
individual employees, plaintiffs must still pass a high hurdle 
to prove that this case should go to trial. Using the classic 
Burdine framework, Texas Dep't of Community Affairs v. 
Burdine, 450 U.S. 248 (1981), the Court must determine if 
plaintiffs have established a prima facie case: (1) prohibited 
employer conduct; (2) taken for the purpose of interfering (3) 
with the attainment of any right to which the employee may 
become entitled. Berger v. Edgewater Steel Co., 911 F.2d 
911, 922 (3d Cir. 1990), cert. denied, 111 S. Ct. 1310 (1991). If 
plaintiffs establish a prima facie case, then defendants must 
articulate a legitimate, nondiscriminatory reason for their 
actions. If defendants meet that burden, then plaintiffs must 
prove that the proffered reason is pretextual. McDonnell 
Douglas Corp. v. Green, 411 U.S. 792 (1973).

 Defendants have presented evidence showing that the moti-
vation behind the furloughs and outsourcing of the fleet 
service work was to save money. Hallcom Aff. WW 16-22. In 
his affidavit, Terry Hallcom stated that Trump Shuttle never 
made a profit and by early 1990 was in dire financial straits 
because of the large debt incurred to purchase and upgrade 
the Shuttle. Hallcom Aff. p 7. By late September 1991, 
Trump Shuttle was nearly unable to generate sufficient reve-


nues to pay its operating costs. Hallcom Aff. p 9. After the 
banks took over and USAir entered the management agree-
ment, the Shuttle began to cut costs and improve operations 
to enable it to become economically self-sustaining. Hallcom 
Aff. p 9. In 1992, the Shuttle increased its cost cutting 
measures, including job force reductions in all classifica-
tions--management, pilots, fleet service, mechanics, and flight 
attendants. Hallcom Aff. p 16. From April 12, 1992, to 
August 31, 1995, Shuttle reduced its number of employees 
from 972 to 553, as well as reducing the number of aircraft 
and backup flight management, renegotiating vendor and 
service contracts, and changing operations and maintenance 
procedures. Id. In March 1993, Shuttle outsourced the 
overnight cleaning workers in order to cut costs and get 
higher quality service. Hallcom Aff. WW 18-20. Pleased with 
the savings in money and the improvement in services, Hall-
com decided to outsource the remaining fleet service work to 
Hudson General for a cost that was 50% less than the 
Shuttle's existing cost for the work. Hallcom Aff. p 22. 
According to Hallcom, since 1992 the Shuttle has saved more 
than $21 million a year as a result of these cost cutting 
measures, which equals a 25% reduction in total operating 
expenses. Hallcom Aff. p 25. In 1989, the Shuttle lost over 
$66 million; in 1994, the Shuttle generated a small profit and 
is presently an economically self-sustaining business. Id. 
Hallcom states, "Shuttle's reason for discharging Plaintiffs 
was economic necessity. The furloughs were effectuated by a 
company in financial distress and were but one part of a 
massive cost reduction program applied to every facet of the 
Shuttle's operation in an attempt to reduce costs sufficiently 
to allow the Shuttle to survive." Hallcom Aff. p 26. Because 
the decision to furlough plaintiffs was motivated by the desire 
to cut costs and save the airline, defendants claim that there 
was no unlawful intent to deprive plaintiffs of pension bene-
fits.

 In response to defendants' evidence that the motivation for 
the furloughs was to cut costs, plaintiffs complain about 
documents they allegedly did not receive in discovery. Plain-
tiffs claim, without any citations to the record, that they did 
not receive notice of changes to the pension plan in 1991 and 


that such changes were not reported to the Department of 
Labor. Plaintiffs testified in their depositions that Gordon 
Linkon and Terry Hallcom of Shuttle, as well as plaintiffs' 
manager Joita McGlynn, told them that no changes would be 
made when USAir first took over the management of the 
Shuttle. Pls.' Exs. 45-49. Plaintiffs also testified that repre-
sentatives of USAir stated that Shuttle fleet service workers 
would be integrated with USAir fleet service workers with 
their full seniority. Pls.' Exs. 52-53, 55, 59. Plaintiffs submit 
a memorandum from Hallcom to "All Employees," dated 
March 6, 1992, (five months before the combined fleet service 
workers voted against union representation) stating that 
"[e]ffective day one [of USAir's management of Shuttle] there 
will be no changes. Any changes that may occur will be done 
systematically as we begin to get established as the USAir 
Shuttle." Pls.' Ex. 69. Plaintiffs submit evidence that the 
Shuttle's pensions generally were "underfunded" based on 
actuarial calculations of projected benefits versus projected 
assets. Pls.' Exs. 70-72.

 Plaintiffs also cite to the affidavit and deposition testimony 
of E. Patricia Evers, former Director of Administration at the 
Shuttle. Evers testified that Hallcom referred to the Shuttle 
work force as an "old and aging work force." Evers Dep. at 
195. She testified that Hallcom talked with her about the 
cost of the pension plan and was concerned that the annual 
contributions Shuttle had to make to the plan based on the 
actuarial tables was too high. Id. at 159-60; 171. She 
testified that Hallcom was concerned about the amount of 
money Shuttle had to pay to the pension plan for the time 
that employees had worked at Eastern Airlines. Id. at 173-
74. She testified that, prior to the decision to furlough the 
fleet service workers, Hallcom instructed the Shuttle's actuar-
ies to compute the cost savings to the Shuttle under different 
scenarios of the fleet service workers' pension plan, such as if 
the plan were "frozen." Id. at 186-94. She also testified that 
she was not involved in the decision to furlough plaintiffs and 
did not discuss the decision with Hallcom, who made the 
decision. Evers Dep. at 79, 153-59. Hallcom did not tell her 
why the fleet service workers were furloughed.


 In response to Shuttle's interrogatory, "Do you believe 
that Shuttle ever acted with a motive to deprive you of any 
retirement, health or other benefit associated with your em-
ployment? If so, identify every statement, fact or document 
that supports your belief," every plaintiff uniformly answered, 
inter alia, "a 'USAir Shuttle spokesman' advised People 
Magazine, that I was laid off because the Shuttle wanted 'an 
optimized cost-efficient operation'," and "President Hallcom 
advised People Magazine that I was laid off because 'the 
Shuttle management needed to cut jobs to cut costs'," and 
"President Hallcom informed Crain's New York Business in 
January 1994, that since November 1993 Shuttle has been 
paying off interest and principal on its outstanding debt to 
Citicorp and Citibank. The cost 'savings' that allowed Shut-
tle Inc. to pay the bank resulted from my layoff." Pls.' 
Answers to Interrog. 10. Plaintiffs also testified in their 
depositions that they believed they were furloughed to cut the 
costs of their salaries, benefits, health plans, and pension 
plans. See, e.g., DiSpigno Dep. at 105.

 Under Andes v. Ford Motor Co., 70 F.3d 1332, 1338 (D.C. 
Cir. 1995), in a case like this one, "the plaintiffs can satisfy 
s 510 only by showing that some ERISA-related characteris-
tic special to the unit (such as its having a clearly above-
average proportion of employees with pension rights about to 
vest) was essential to the firm's selecting the unit for closure 
or sale." The evidence shows that Shuttle was in dire 
financial straits and, since 1992, has undergone dramatic cost 
cutting measures, including reducing its number of employees 
by 419 persons--over 40% of the workforce. It is hard to 
imagine, and plaintiffs have failed to show, that defendants 
targeted these eighty-six persons to furlough because of their 
pension costs. The problems that Shuttle was facing were 
much larger than plaintiffs' pension costs--for example, the 
fact that Shuttle lost over $66 million in 1989 and still had 
tremendous debts to repay. Although the fleet service work-
ers were an "aging" group of employees and Hallcom was 
concerned about the cost of the contributions that Shuttle was 
making to their pensions, such evidence is not enough to show 
a specific discriminatory intent. Plaintiffs must show more 


than that Shuttle furloughed plaintiffs to save money. As the 
Fourth Circuit explained:

 [Plaintiff] tries to save his claim by citing statements that 
 [defendant] sought to meet its "financial need" by termi-
 nating him, and that financial need necessarily includes 
 pension costs. [Plaintiff's] suggestion that [defendant] 
 acted illegally because it acted to save money proves too 
 much. Under that reasoning, any actions by an employ-
 er that result in savings would be suspect. It is obvious 
 that benefit costs make up a large amount of the costs of 
 an employee to a company, and that pension rights are a 
 substantial component of benefit costs, but these undeni-
 able propositions are not sufficient standing alone to 
 prove the requisite intent by the path of pretext.

Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 239 
(4th Cir. 1991).

 With respect to plaintiffs' furloughs, the undisputed evi-
dence shows that Shuttle furloughed plaintiffs in order to cut 
costs and save the company. Plaintiffs have presented no 
evidence to show that Shuttle was motivated by any other 
factor. Because plaintiffs cannot show a specific intent to 
discriminate, they have failed to establish a prima facie case. 
Even if they had established a prima facie case, their claim 
would fail because they did not show that Shuttle's legitimate, 
nondiscriminatory reason for the furloughs was a pretext.

 With respect to plaintiffs' claims that USAir did not offer 
plaintiffs the same benefits as non-Shuttle USAir employees, 
the Court notes that the planned integration of Shuttle fleet 
service workers into the USAir work force never took place. 
According to Hallcom, the integration plans failed because of 
the difficulties encountered by the IAM in resolving an intra-
union dispute from attempting to combine the senior Shuttle 
mechanics into the resistant USAir mechanic work force and 
the parallel issue presented by the fleet service integration. 
Hallcom Aff. p 14. Simply because defendants intended to 
integrate the workers, and the integration plans failed, does 
not give rise to a claim under ERISA. Plaintiffs have no 


claims to USAir pension benefits because they were never 
members of a USAir pension plan.

 With respect to plaintiffs' factually unsupported claims that 
Shuttle violated ERISA by failing to disclose certain pension 
plans to plaintiffs and the Department of Labor, plaintiffs cite 
Varity Corp. v. Howe, 116 S. Ct. 1065 (1996). Varity does not 
apply to the present case, however, because Varity was not 
an ERISA s 510 case and all five ERISA counts in plaintiffs' 
complaint come under s 510. Because plaintiffs have failed 
to provide any evidentiary support for this claim, and have 
not brought a count in their second amended complaint 
alleging any failure of Shuttle to disclose the pension plan to 
plaintiffs or the Department of Labor, the Court will reject 
these claims. The Court will grant the motions of USAir and 
Shuttle for summary judgment on the ERISA counts.

II.ADEA, 29 U.S.C. ss 621-34 (1994), Counts 16, 17, 18

 The Court of Appeals for this Circuit has stated:

 To make out a prima facie case of age discrimination ... 
 a plaintiff must demonstrate facts sufficient to create a 
 reasonable inference that age discrimination was "a de-
 termining factor" in the employment decision. Such an 
 inference is created if the plaintiff shows that he (1) 
 belongs to the statutorily protected age group (40-70), 
 (2) was qualified for the position, (3) was not hired, and 
 (4) was disadvantaged in favor of a younger person. 
 Once a prima facie case has been established, the em-
 ployer has the burden of producing evidence tending to 
 show that the applicant was denied employment for a 
 legitimate, nondiscriminatory reason. If the employer 
 does so, and if his evidence is credible, the plaintiff must 
 show by a preponderance of the evidence that the em-
 ployer's asserted legitimate reason is merely pretextu-
 al.... The plaintiff, who at all times retains the burden 
 of persuasion, must then show by a preponderance of the 
 evidence that age was "a determining factor" in the 
 employer's decision.


Cuddy v. Carmen, 694 F.2d 853, 856-58 (D.C. Cir. 1982) 
(citations omitted). The Supreme Court has clarified that 
there is no disparate treatment under the ADEA when the 
factor motivating the employer is some feature other than the 
employee's age. Hazen Paper Co. v. Biggins, 507 U.S. 604 
(1993). Plaintiffs must show that age was a factor in the 
decision to furlough them. The Burdine framework dis-
cussed above applies to ADEA cases.

 Some of the plaintiffs were not forty years old at the time 
of the furloughs. The ADEA provides that one must be at 
least forty years old to bring an ADEA claim. 29 U.S.C. 
s 631(a); see also O'Connor v. Consolidated Coin Caterers 
Corp., 116 S. Ct. 1307, 1310 (1996) (noting that the ADEA 
"limits the protected class to those who are 40 or older"). 
Plaintiffs contend that employees who were not yet forty 
years old when they were furloughed should be allowed to 
maintain ADEA claims because they were associated with the 
aging group. Plaintiffs have absolutely no legal support for 
this assertion. The Court rejects their attempt to bring 
ADEA claims for employees who were under forty years of 
age and will grant defendants' motion to dismiss their claims 
for failure to meet the first element of the prima facie case.

 With respect to the plaintiffs who were at least forty years 
old at the time of the furloughs, their highest hurdle in the 
prima facie case is showing that younger persons were 
treated more favorably than they were. Plaintiffs argue that 
the average age of Hudson General's employees is younger 
than the average age of Shuttle's furloughed fleet service 
group. The defendants, however, had no role in deciding who 
Hudson General would hire as its employees. Because defen-
dants had no control over the selection of Hudson General's 
employees, the average age of Hudson General's employees is 
irrelevant to this case. Plaintiffs have failed to show that 
defendants treated younger persons more favorably than 
plaintiffs. The Court will grant defendants' motion to dismiss 
their claims for failure to meet the fourth element of the 
prima facie case.


 Even if plaintiffs did establish a prima facie case of age 
discrimination, they would still lose their claims at the sum-
mary judgment level. Defendants have produced evidence 
showing that plaintiffs were furloughed for a legitimate, 
nondiscriminatory reason--to save money by outsourcing the 
entire department. Plaintiffs must show by a preponderance 
of the evidence that the defendants' asserted legitimate rea-
son is merely pretextual and that age was "a determining 
factor" in their furloughs.

 Plaintiffs rely on the following evidence to show unlawful 
motivation: (1) the affidavit and deposition testimony of E. 
Patricia Evers; (2) statistics showing that the majority of the 
plaintiffs laid off were over the age of forty; and (3) six 
documents:

 (a) a memorandum labeled at the top "Shuttle, Inc. 
 Corporate Objectives 1992," that includes an objective to 
 reduce costs by developing meaningful early retirement 
 opportunities. Pls.' Ex. 17;

 (b) A letter from Joseph P. Martinico on USAir Shuttle 
 stationery, dated June 5, 1992, to Thomas Reinert at 
 Morgan, Lewis & Bockius, stating in its entirety, "Dear 
 Tom: As discussed, enclosed please find both a set of 
 mailing labels and a listing of the USAir Shuttle Fleet 
 Service employees. If there is anything else I can do to 
 assist you, please call me at [phone number]." Pls.' Ex. 
 18;

 (c) A newspaper article from the Washington Times, 
 dated November 13, 1993, in which the author wrote that 
 Shuttle President Terry Hallcom "said the shuttle is 
 essentially a 5-year-old company that has employees 
 with 25-year-old seniority." Pls.' Ex. 19;

 (d) A memorandum from Terry Hallcom, dated Novem-
 ber 5, 1993, to workers at the Shuttle regarding early 
 retirement, in which Hallcom announced that retirement 
 eligible employees had the option of selecting either an 
 early retirement package or the resignation offer, Pls.' 
 Ex. 20;

 (e) An undated, unsigned document titled "Number of 
 Employees Reaching 'Normal' Retirement Age," listing 


 the number of mechanics and the number of fleet service 
 workers who presumably would reach retirement age in 
 the years 1991-2001, Pls.' Ex. 21; and

 (f) A memorandum from Terry Hallcom, dated July 30, 
 1992, to "All Pilots," regarding the company's policies 
 with respect to pilots over the age of sixty.

 The Court cannot discern unlawful motivation in the evi-
dence submitted by plaintiffs. E. Patricia Evers testified 
that she was not involved in the decision and that Hallcom, 
who was involved in the decision to furlough the fleet service 
workers, did not tell her why they were furloughed. Evers 
Dep. at 158-59. She stated that she "wasn't privy" to Hall-
com's plans to re-engineer the Shuttle, but that she would see 
things if they were left in the copying machine sometimes. 
Evers Dep. at 152. Although she stated that Hallcom used 
the phrase "old and aging workforce," Evers Dep. at 195-96, 
Evers could not testify if age was a factor in the decision to 
furlough plaintiffs because she was not involved in the deci-
sion. Evers's testimony, at most, shows that Hallcom knew 
the ages of the workers and how much it cost Shuttle to keep 
them employed. Such evidence does not show unlawful moti-
vation. The remainder of plaintiffs' evidence likewise fails to 
show discriminatory intent in the decision to furlough the 
fleet service workers. The Court concludes that plaintiffs 
have failed to create a genuine issue as to whether their 
furloughs were more probably than not due to age discrimina-
tion. The Court will grant the motions of USAir and Shuttle 
for summary judgment on the ADEA claims.

III.WARN, 29 U.S.C. ss 2101-09 (1994), Count 14 

 Plaintiffs claim that defendants violated the Worker Ad-
justment and Retraining Notification Act ("WARN") because 
defendants failed to give plaintiffs sixty days advance notice 
before furloughing plaintiffs and failed to offer plaintiffs an 
opportunity to retrain. Plaintiffs also allege that they were 
denied their WARN rights because of their union activities.

 Defendants argue that plaintiffs do not have a claim under 
WARN because the termination of their employment did not 


constitute a "plant closing" or a "mass layoff" as defined by 
the statute. Under the WARN Act, plaintiffs must show that 
there was a reduction in force "of one or more facilities or 
operating units within a single site of employment" which, 
during a thirty day period, terminated the employment of at 
least thirty-three percent of the employees and at least fifty 
employees. 29 U.S.C. s 2101(a) (1994).

 The reduction in force took place at three different loca-
tions--Washington National Airport, Boston's Logan Airport, 
and New York's LaGuardia Airport. Each airport must be 
considered separately as the three are not a "single site of 
employment." The only airport that even comes close to 
having a fifty person layoff is LaGuardia. Plaintiffs claim 
that forty-four fleet service workers and seventeen "addition-
al" people were laid off at LaGuardia in a thirty day period. 
These "additional" people were not fleet service workers, but 
were flight attendants, inside ticket agents, clerks, and a staff 
accountant.

 Defendants claim that forty-three fleet service workers 
were laid off, and that the "additional" people were not part 
of the "operating unit" pursuant to WARN regulations, 20 
C.F.R. s 639.3(j). Defendants also claim that the "addition-
al" people were discharged for cause or voluntarily resigned, 
and thus do not come under the WARN definition of "employ-
ment loss," 29 U.S.C. s 2101(a)(6).

 The Court agrees that these "additional" people cannot 
count for the fifty person minimum layoff because they were 
not part of the fleet service "operating unit," as required by 
the statute. Moreover, plaintiffs have failed to allege that at 
least thirty-three percent of the employees at LaGuardia 
were terminated during the same thirty day period. The 
Court will grant the motions of USAir and Shuttle for sum-
mary judgment on the WARN claim.

 IV.Barone, et al.--option for retirement eligible plain-
 tiffs; Cross-Motion of Shuttle

 Nineteen plaintiffs (Barone et al.) were fifty-five years of 
age or older when they were furloughed. These plaintiffs 


claim they were eligible to retire on November 1, 1993. They 
did not retire, and around November 13, 1993, they were 
furloughed from their fleet service jobs. Shuttle gave these 
plaintiffs a choice of either a retirement package (enhanced 
medical benefits, lifetime travel, etc.) or severance pay (15 
weeks of pay). Furloughed employees who were under fifty-
five years old received just the severance pay. Barone et al. 
claim they were entitled to both the retirement package and 
the severance pay. These plaintiffs claim that the denial of 
one of the two options was made in violation of the ADEA. 
They have filed a motion for summary judgment on this issue.

 Shuttle has filed a cross-motion for summary judgment on 
this issue. Shuttle's main argument is that the Shuttle 
offered enhanced benefit options to these older employees. 
Twenty-one out of the twenty-two retirement eligible employ-
ees took the retirement package, which Shuttle claims was far 
preferable to the severance pay. Shuttle notes that retire-
ment eligible employees were not denied any benefits offered 
to other employees, but, on the other hand, were given the 
option of taking the same exact thing (furlough and severance 
pay) or a better option (retirement and benefits). Shuttle 
cites Hazen Paper Co. v. Biggins, 113 S. Ct. 1701 (1993), in 
which the Supreme Court held that an employer does not 
violate the ADEA when the factors wholly motivating the 
employer's action are something other than the employee's 
age, "even if the motivating factor is correlated with age, as 
pension status typically is." Id. at 1706. According to defen-
dants, plaintiffs have failed to establish a prima facie case of 
age discrimination.

 The Court concludes that the Barone et al. plaintiffs have 
failed to present evidence creating a genuine issue as to 
whether Shuttle's treatment of them was more probably than 
not due to age discrimination. Plaintiffs' only evidence of age 
discrimination in the retirement option matter is that retire-
ment eligible employees received a choice and younger em-
ployees did not. For the reasons set forth above with respect 
to the ADEA claims of all plaintiffs, and because Barone et al. 
have presented no evidence that they were treated less 
favorably than younger employees, the Court will deny the 


motion of Barone et al. for summary judgment and grant the 
cross-motion of Shuttle.

V.The Validity of the Single Carrier Proceeding

 The main issue in USAir's motion for summary judgment 
and plaintiffs' motion for summary judgment "on the issue of 
the validity of the single carrier proceeding" is the validity of 
the National Mediation Board's single carrier proceeding 
under the Railway Labor Act. Plaintiffs seek a declaration 
that the proceeding is void and invalid as a matter of law.

 Plaintiffs claim that the single carrier proceeding before 
the NMB was invalid because USAir invoked the jurisdiction 
of the NMB. A decision in this Circuit, Railway Labor 
Executives' Ass'n v. National Mediation Bd., 29 F.3d 655 
(D.C. Cir.) (en banc), amended by 38 F.2d 1224 (1994), cert. 
denied, 115 S. Ct. 1392 (1995), invalidated the regulations of 
the NMB that allowed carriers to bring labor dispute claims 
before the NMB in the event of a merger ("the Merger 
Regulations"). According to RLEA v. NMB, the NMB can 
hear a claim only if it is brought by employees or unions.

 The single carrier determination in the present case was 
brought at the joint request of two unions--the Steelworkers 
and IAM--and the carrier. On May 12, 1992, the IAM filed a 
letter with the NMB, stating, "[t]he International Association 
of Machinists and Aerospace Workers, AFL-CIO, ('IAM') 
joins with USAir, Inc. ('USAir') in its letter of April 2, 1992, 
and requests that the Board invoke its Merger Procedures 
and find that USAir and Shuttle, Inc. ('USAir Shuttle') are a 
single carrier for representational purposes under the Rail-
way Labor Act." 2nd Am. Compl. Ex. 8. In RLEA v. NMB, 
the carrier invoked the NMB's jurisdiction without being 
joined by any union. The Court concludes that the NMB's 
single carrier determination was valid because the unions 
joined the petition to invoke the NMB's jurisdiction. Accord-
ingly, the Court does not have jurisdiction to review the 
single carrier determination. Switchmen's Union v. Nation-
al Mediation Bd., 320 U.S. 297 (1943).


 The next issue before the Court is whether, despite the loss 
of union representation, plaintiffs were still protected by their 
collective bargaining agreement. Plaintiffs argue that they 
were. USAir argues that, under the RLA, loss of representa-
tion means loss of the collective bargaining agreement and 
any obligation to maintain the status quo of the conditions 
contained in the agreement. This case falls squarely within 
the reasoning of International Bhd. of Teamsters v. Texas 
Int'l Airlines, Inc., 717 F.2d 157 (5th Cir. 1983), in which the 
Court of Appeals for the Fifth Circuit stated:

 Given the Mediation Board's undeniable sole jurisdiction 
 over representation matters, we infer from the practical 
 problems of divided jurisdiction a congressional intention 
 to allow that agency alone to consider the post-merger 
 problems that arise from existing collective bargaining 
 agreements.... After a merger that makes the employ-
 ee group hitherto represented by the Union a minority of 
 the craft, the question of employee representation inevi-
 tably arises. When this happens, resolution of that 
 question is the function of the National Mediation Board.

Id. at 164. According to Texas Int'l Airlines, the issue of 
whether plaintiffs were to be represented by a union was 
within the exclusive, nonreviewable jurisdiction of the NMB. 
Although the NMB lacks authority to enforce contracts be-
tween carriers and unions, see Chicago & N.W. Ry. v. United 
Transp. Union, 402 U.S. 570 (1971), the NMB has exclusive 
authority to govern "representational" disputes, including 
whether a majority of the employees desire the union's 
representation and whether two related carriers will be treat-
ed as one for representation purposes.

 The danger that would arise if the Court were to accept 
plaintiffs' proposition that their Trump Shuttle-IAM collec-
tive bargaining agreement remained in existence after the 
fleet service group voted against union representation is that 
the Court would, in effect, recognize the union as the fleet 
service group's bargaining agent. A collective bargaining 
agreement "is not merely a contract negotiated by an agent 
on behalf of a group of principals, thereafter to be performed 


and enforced entirely by the principals. It recognizes the 
Union as the employee's bargaining agent. It delegates to 
the Union the right to enforce its provisions as the agent of 
the employees. By its terms the agreement is a collective 
bargaining agreement not a series of individual employment 
contracts. If the employees designate a new collective bar-
gaining representative, it succeeds to the status of the former 
representative without alteration in the contract terms. [cita-
tions] The agreement cannot survive, however, without some 
bargaining agent." Id. at 163-64.

 The Court of Appeals for this Circuit has discussed Texas 
Int'l Airlines in several cases, including Association of Flight 
Attendants v. Delta Air Lines, Inc., 879 F.2d 906, 912-13 
(D.C. Cir. 1989), cert. denied, 494 U.S. 1065 (1990), and 
Association of Flight Attendants v. USAir, Inc., 24 F.3d 
1432, 1440 (D.C. Cir. 1994). In Association of Flight Attend-
ants v. United Airlines, Inc., 71 F.3d 915, 918 (D.C. Cir. 
1995), in the context of discussing the Texas Int'l Airlines 
decision, the Court of Appeals noted that, "of course, if the 
NMB were to subsequently determine that the affected em-
ployees fell within a much broader class or craft in which the 
union did not enjoy majority support, the contractual relation-
ship would necessarily terminate." At least some of the 
plaintiffs understood that if the combined USAir/Shuttle fleet 
service group voted against union representation, they would 
lose their union and their contract:

Question:What was your concern about no union win-
 ning the election?

Answer: Without a union, we have no contract.

DiSpigno Dep. at 186.

 The Court concludes that, when plaintiffs were combined 
with the much larger group of USAir fleet service workers 
and the combined vote resulted in no union representation, 
plaintiffs' representation and collective bargaining agreement 
necessarily terminated. For the reasons set forth above and 
in the memoranda and argument of USAir, the Court will 
grant USAir's motion for summary judgment on this issue, 


which was joined by Shuttle, and deny the motion of plain-
tiffs.

 Plaintiffs also bring an "anti-union animus" claim under the 
RLA, s 2, Fourth. Section 2, Fourth prohibits carrier inter-
ference with employee efforts to organize unions. The lead-
ing s 2, Fourth case in this Circuit is Air Line Pilots Ass'n v. 
Eastern Air Lines, 863 F.2d 891 (D.C. Cir. 1988), cert. 
dismissed, 501 U.S. 1283 (1991). According to that case, an 
employer is limited to taking only measures that it would 
have taken in the absence of any anti-union animus. Id. at 
902. "[U]nions should not be able to immunize their mem-
bers from market forces merely by engaging in conduct 
virtually certain to provoke anti-union feeling." Id. at 902. 
In the present case, plaintiffs cite to a comment made by 
Terry Hallcom, Shuttle President and a former Eastern pilot, 
to plaintiff James May about how Hallcom might still be 
flying Eastern planes if the union and Eastern had been able 
to reach a deal. May, who also used to work for Eastern, 
agreed that Hallcom's statement about the Eastern situation 
was "quite possibl[y]" true. Plaintiffs also cite to a memoran-
dum written by Hallcom to a labor relations employee at 
USAir in which Hallcom advocated a hard bargaining position 
with the unions.

 Hallcom's comment about Eastern does not show anti-union 
animus. His comment also does not show a causal connection 
between the alleged animus and plaintiffs' furloughs. The 
memorandum does not show anti-union animus, either. It 
merely shows Hallcom's position on bargaining with unions. 
Hard bargaining, by itself, does not show anti-union animus. 
Defendants have presented ample evidence that plaintiffs 
were furloughed to save money; plaintiffs have presented no 
evidence that their furloughs were caused by anti-union ani-
mus. Accordingly, the Court will grant summary judgment 
for defendants on this issue.

VI.State Law Claims

 Plaintiffs bring numerous state law claims. The Court 
rejects all of plaintiffs' state law claims because such claims 
are clearly preempted by the Railway Labor Act or ERISA. 


See 29 U.S.C. s 1144(1) ("the provisions of this subchapter 
... shall supersede any and all State laws insofar as they 
may now or hereafter relate to any employee benefit plan 
described in section 1003(a) of this title"); Ingersoll-Rand 
Co. v. McClendon, 498 U.S. 133 (1990). 

VII.Motion of IAM

 IAM is a defendant in Counts Seven (state law fraud), 
Fifteen (breach of duty of fair representation), and Sixteen 
(Age Discrimination in Employment Act). IAM contends 
that Count Fifteen was filed after the limitation period and 
must be dismissed as untimely. IAM argues that the state 
law claim is preempted by the federal claim and must also be 
dismissed. Finally, IAM claims that it is entitled to summary 
judgment on the ADEA claim because there is no evidence 
that IAM caused or attempted to cause the furloughs.

 A. Breach of Duty of Fair Representation (Count 15)

 Technically, the Railway Labor Act has no "duty of fair 
representation" provision. In Steele v. Louisville & Nash-
ville R. Co., 323 U.S. 192, 199 (1944), however, as part of a 
series of cases involving alleged racial discrimination by un-
ions, the Supreme Court recognized that the Railway Labor 
Act imposes a duty on the union to represent all members of 
the bargaining unit fairly. Under this doctrine, the union has 
a duty "to serve the interests of all members without hostility 
or discrimination toward any, to exercise its discretion with 
complete good faith and honesty, and to avoid arbitrary 
conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967) (quoted in 
Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 76 (1991)).

 IAM argues that this action must be dismissed against it 
because plaintiffs filed this complaint outside the six month 
limitation period. Plaintiffs do not challenge that the appro-
priate limitation period is six months. That time period 
comes from DelCostello v. International Bhd. of Teamsters, 
462 U.S. 151, 155 (1983), in which the Supreme Court bor-
rowed the six month period from s 10(b) of the National 
Labor Relations Act. The Fourth Circuit applied DelCostello 
to a case under the Railway Labor Act in Triplett v. Brother-


hood of Ry., Airline & S.S. Clerks, 801 F.2d 700, 702 (4th Cir. 
1986).

 The limitation period began to run when plaintiffs knew or 
should have been aware of their injury. IAM argues that the 
period began to run after the election, when plaintiffs lost 
their union representation. The undisputed facts show the 
union had no contact with plaintiffs after August 11, 1992, 
other than telling plaintiffs that it no longer represented 
them. Plaintiffs were furloughed in March and November 
1993, and filed this lawsuit in May 1994.

 Plaintiffs' only argument for tolling the limitation period is 
that they believed the union would continue to represent 
them after the vote to reject union representation. Although 
it was clear that they were no longer represented by a 
union--IAM sent them a letter telling them it no longer 
represented them; plaintiffs stopped paying union dues to 
IAM; plaintiffs applied for withdrawal cards and withdrew 
from the union, see, e.g., Pls.' Answers to IAM's Interrog. 2--
plaintiffs maintain that IAM told them that it would continue 
to negotiate their integration with USAir regardless of the 
election results. Plaintiffs claim that it was not until the 
second group of them was furloughed on November 13, 1993, 
that they knew, or should have known, that the IAM was not 
going to negotiate the integration on their behalf. In support 
of this proposition, plaintiffs cite the following facts:

 (1) A letter dated April 23, 1992, from IAM General Vice 
 President John F. Peterpaul, which was posted at plain-
 tiffs' work stations. Peterpaul describes the background 
 of the single carrier proceeding (which had not yet been 
 decided) and then states that "[w]hen the National Medi-
 ation Board approves the petition for the single employ-
 er, this will then put us in a posture to sit down and 
 negotiate a full integration agreement with USAir con-
 taining the necessary wages, hours and working condi-
 tions." In the final paragraph, Peterpaul tells the recipi-
 ent of the letter, "[y]ou should also advise the Shuttle 
 members that, no matter what the final determination of 
 the NMB, because USAir will control the Shuttle opera-


 tion and USAir is within the jurisdiction of District 
 Lodge 141, in order to better service our members, the 
 Shuttle contract and our members will be transferred 
 into District 141 as soon as it is appropriate." Pls.' Ex. 
 134.

 (2) An undated letter to Lou Schroeder from "A Group 
 of Flying Tiger Members" thanking Schroeder and the 
 rest of IAM District 141 for their help in an arbitration. 
 The Flying Tiger Members also thank IAM for allowing 
 Airline Coordinator Bill Scheri to testify for them. They 
 conclude, "We all hope that when the times and condi-
 tions are most appropriate, the IAM will make a strong 
 effort to reorganize FedEx, and bring us under the 
 banner of the IAM." Pls.' Ex. 136.

 (3) An undated "Opinion and Award" in Seniority Inte-
 gration in the matter of the arbitration between Federal 
 Express Corporation, Federal Express Mechanics, and 
 former Flying Tiger Mechanics, Stock Clerks and Relat-
 ed Employees. George Kavros, Assistant General Chair-
 man, IAM District Lodge 141, appeared for the Flying 
 Tiger Line Seniority Committee. The opinion notes the 
 testimony of Bill Scheri.

 (4) The deposition testimony of Pierre Schrichte, a for-
 mer plaintiff in this action who has been voluntarily 
 dismissed, that he believed IAM "would do for us what 
 they did for the brother members at Flying Tiger." 
 Schrichte Dep. at 52.

 The Court concludes that this evidence fails to raise a 
genuine issue of material fact about whether IAM told plain-
tiffs that it would continue to represent them even after it 
was voted out. The April 23, 1992, letter does not discuss 
what IAM would do if it lost the election, and nowhere states 
that IAM would continue to negotiate for plaintiffs if it were 
no longer their bargaining representative. The evidence 
about Flying Tiger and the testimony of a voluntarily dis-
missed plaintiff that he thought IAM would do for him what it 
did for Flying Tiger simply does not show that IAM misled 
plaintiffs into thinking that IAM would continue to negotiate 


on plaintiffs' behalf after it lost the election. The undisputed 
evidence shows that plaintiffs knew, shortly after the election, 
that IAM no longer represented them. Having failed to 
present any evidence that IAM told plaintiffs it would contin-
ue to negotiate on their behalf, the Court finds as a matter of 
law that plaintiffs' cause of action with respect to IAM 
accrued as of the date they knew or should have known that 
they were no longer represented by IAM, August 1992, or, at 
the very latest, when the first group of plaintiffs was fur-
loughed in March 1993. Plaintiffs did not file this lawsuit 
until May 9, 1994, well after the six month limitation period. 
Accordingly, the Court will grant the motion of IAM for 
summary judgment on Count 15.

 B. State Law Fraud & Deceit (Count 7)

 IAM argues that the state claim of fraud and deceit is 
preempted by the federal duty of fair representation under 
Vaca v. Sipes, 386 U.S. 171, 177 & 188-95 (1967). In a 
Fourth Circuit case with issues similar to the present case, 
the Court of Appeals held that the federal duty of fair 
representation preempts identical state law claims. See Nel-
lis v. Air Line Pilots Ass'n, 15 F.3d 50, 51 (4th Cir.), cert. 
denied, 115 S. Ct. 56 (1994). At oral argument, when asked 
to articulate how the state law claim differs from the federal 
claim, counsel for plaintiffs stated: "Because lying isn't con-
doned under a collective bargaining agreement. And if you 
do that, you are subject to state rules concerning it. That's 
the short answer, Your Honor." Vol. III, Tr. of Mot. Hrg., 
June 27, 1996, at 86. The Court finds no merit in plaintiffs' 
argument and agrees with IAM that plaintiffs' state law claim 
is the same as the federal claim. Accordingly, the state law 
claim must be dismissed.

 C. Age Discrimination (Count 16)

 IAM argues that it is entitled to summary judgment on 
plaintiffs' age discrimination claim because there is no evi-
dence that the union caused or attempted to cause plaintiffs' 
furloughs. From August 1992, including through the March 
and November 1993 furloughs, plaintiffs were not represented 
by IAM. The ADEA makes it "unlawful for a labor organiza-


tion ... to cause or attempt to cause an employer to discrimi-
nate against an individual in violation of this section." 29 
U.S.C. s 623(c). Because there is no evidence of record that 
IAM had anything to do with plaintiffs' furloughs, the Court 
will grant IAM's motion for summary judgment on Count 16.

 D. Conspiracy 

 In its opposition memorandum, plaintiffs appear to bring 
conspiracy claims against IAM that are not in the complaint. 
Plaintiffs allege that the union acted against plaintiffs with 
anti-union animus because IAM thought plaintiffs were 
"scabs." Section 2, Fourth of the Railway Labor Act, dis-
cussed above, applies only to carriers. There is no cause of 
action for a union that allegedly acted with anti-union animus. 
The Court also notes that plaintiffs have failed to present any 
evidence that IAM was part of a conspiracy against plaintiffs.

VIII.Motion of Citibank and Citicorp

 Citicorp is a bank holding company. Citibank is a lender 
and agent for a consortium of twenty-two financial institu-
tions which lent approximately $380 million to Donald Trump 
to purchase Shuttle. Citibank is a shareholder of Shuttle. 
Plaintiffs claim that John S. Reed, the Chief Operating Offi-
cer of Citicorp, and Wendy Silverstein, a vice president of 
Citibank and one of the directors of Shuttle, were personally 
involved in the decision to furlough plaintiffs.

 The record overwhelmingly shows that Citicorp and Citi-
bank had no involvement in plaintiffs' furloughs. Plaintiffs' 
vast conspiracy theory has failed to materialize after discov-
ery. See Vol. III, Tr. of Mot. Hrg., June 27, 1996, at 4-46. 
Although Citibank was actively involved in restructuring 
Trump's loan and creating Shuttle, Inc. in an attempt to 
recover some of the money lent to Trump, it is clear that 
Citibank and Citicorp had no role in managing the operations 
of the Shuttle. The evidence shows that Citicorp and Citi-
bank are not "carriers" under the RLA, had no involvement 
in petitioning the NMB for the single carrier determination, 
were not plaintiffs' "employer," had no involvement in plain-
tiffs' employee benefit plan, and had no involvement in the 


decision to furlough plaintiffs. Because plaintiffs have failed 
to raise any genuine issue of material fact for trial with 
respect to Citicorp and Citibank's involvement in their em-
ployment or their furloughs, the Court will grant the motion 
of Citicorp and Citibank for summary judgment on all counts.

 Conclusion

 For the reasons set forth above, the Court will grant the 
motions for summary judgment of all defendants and deny 
the motions of plaintiffs. An appropriate Order will issue.

 ____________________________________ 
 

 NORMA HOLLOWAY JOHNSON 

 UNITED STATES DISTRICT JUDGE